Good morning, Your Honors. Joe Mellon here on behalf of the Plaintiff Appellant Nydia Novak and Alejandro Novak. Your Honors, the District Court, through misapplication of both law and misinterpretation of facts relevant to the theories that plaintiff was presenting in this case, has clearly made errors and I think we've demonstrated in our briefs and I will try to demonstrate in the argument today the nature of those errors. The trial took place on two separate weeks in September and December of 2005. The first week of trial was interrupted by the appearance of a witness who had not been disclosed as a witness for the trial. The court continued the trial, heard argument of counsel whether to modify the scheduling order and allowed the addition of this witness. This created an evidentiary issue that I think had some significance to the court's ultimate opinion in this case. The case was then concluded in December. The court in about June of 2006 issued a decision and invited the U.S. Attorney to provide findings of facts and conclusions of law consistent with the decision of the court. We as plaintiffs were also invited at that time to respond to the filings by the government and also to prepare our own findings of fact and conclusions of law. And I bring this up because we did prepare that document, did submit it to the court, essentially explaining to the court that the findings of fact and conclusions of law that were being considered really represented a misunderstanding or a misinterpretation of the theories of the case that the plaintiff was presenting. Now I want to give you, I can give you some examples of this through the court's findings and through the theories presented by the plaintiff. This was somewhat of a complicated case, but in the total analysis it did not turn out to be as complicated as perhaps it may have appeared at the outset. The plaintiff's theory at trial was first that the Veterans Administration should have diagnosed a traumatic brain injury in the years between 1977 and 1981. As the record indicates, Ms. Toro at the time was discharged from military service in 1977. She had been in an automobile accident early in the year of 1977 and remained undiagnosed with a traumatic brain injury after she was... Was that a discharge or a relief from active duty? Well, she was relieved from active duty. She did remain in the reserves. So it was technically a discharge, was it? A discharge from active service in the military. You're correct, Your Honor. She would be under the Ferris doctrine at that time, wouldn't she? Plus she was in active service. Yes, and we're not making a claim for any medical malpractice in the treatment while she was on active duty immediately following the automobile accident. Our claims are relating to treatment sought at Veterans facilities beginning in, I believe, perhaps it was even 1978 before she first presented. Was she discharged then, have a final discharge in 1989? Your Honor, I'm not certain when, but I think it was about 1989. She was then no longer able to perform any military service, and I think that was a discharge from 1989. That certainly was, because she was unable to perform the services necessary. So our theory and our claim was that between 1977 and 1981, Ms. Novak presented frequently and was very adamant in her presentations at Veterans Administration facilities that she had a problem that was related to her service in the Army at the time. And these claims just were ignored, and we claim that it was malpractice on the part of the various physicians that she saw in several states. I think she saw people in New York, in New Mexico, in San Juan, Puerto Rico, and over that period of time. These weren't exclusively military or Veterans Administration doctors, were they? She saw some other doctors along that time. Yes, she did. On occasion, I think she was in school, she had a health care benefit with schooling, and during some employment she saw other physicians as well. But our point, Your Honor, in the lawsuit was that these Veterans facilities were in the unique position of having available the necessary records to truly diagnose the problem that Ms. Novak was presenting with. I think I may have misheard. I was not under the impression that you were seeking to recover from malpractice that occurred prior to 1981. I mean, is that incorrect? Yes, that is incorrect. Between 1978 and 1981, Ms. Toro presented on numerous occasions. I understand that, but I mean, I didn't think you were seeking recovery for that time period. That would have to do with the automobile accident that occurred in 1977, right? Well, Your Honor, if I could explain. The automobile accident in 1977 caused a traumatic brain injury which went undiagnosed. Okay, I understand that that is your theory. But are you charging any malpractice for that incident or for anything else up to the time when she had the second automobile accident? Yes, it is our claim that the physicians that she saw in the Veterans Administration facilities had a duty to investigate and to at least diagnose that she had a traumatic brain injury. Okay, but wouldn't that be squarely within Ferris? Any damages for the traumatic brain injury, yes, Your Honor. Okay, so then can we move forward in time up to the point where you, in fact, do seek recovery? Your Honor, the end of that period would have been 1981 when Ms. Toro saw Dr. Curran. Yes, so isn't Dr. Curran the first specific incident for which you seek recovery? I think that would be correct. The first incident that would identify malpractice that caused damage. Now, I think we have to bootstrap the malpractice that occurred between 1978 and 1981 for our later arguments. I think you'll notice that Judge Kobayashi later says because there was a malpractice, then the post-traumatic stress disorder could not have been an injury. And that's much later in the chronology. But I think our theory, Your Honor, is that up to Dr. Curran, the opportunity was certainly there for the VA to make an appropriate diagnosis. Now, I know we have to deal with the Ferris doctrine, and I think Ferris wouldn't apply if, in fact, a VA physician committed malpractice between 1978 and 1981. Ferris wouldn't be implicated because there was no command, no disciplinary ramifications, none of the indices that we all look at in the more recent cases, including the latest Schoenfeld case. And I think the district court relied almost solely on the fact that she was in inactive reserve, and it relied on the Jackson case that found that an inactive reserve could be barred by Ferris. It didn't look beyond that at the other factors that had to be considered, and primarily where was she treated? She was treated in a VA facility by civilian doctors. No military personnel were involved in that treating, and that happened throughout the entire time that she was under the care of the VA. Okay, but now, is there any other specific example of malpractice that occurred from that point forward other than Dr. Curran in 1981? You're talking from 81 forward now? Yes. No. Okay, so Dr. Curran is the linchpin for that. Yes. All right. So why is it, in your view, that the New York case in Sever- Sever- Sever- I'm not sure how to pronounce it either, Your Honor. Doesn't control? Well, I think the New York case, and we cited a number of other cases in our brief that provided some exceptions, but I think, first off, Severese just says it has to be solely for the purpose of an insurance examination. You know, we've pointed out in the record the document that Ms. Novak filled out. She was seen by a team of doctors for a general physical examination with concentration on a disability which she described as a nervous disorder. And the VA was her care provider. They weren't an insurance company or an employer, and I think the exceptions that we've pointed to also squarely fit the circumstances of this case. She had situations where employers gave chest X-rays and failed to diagnose and things of that nature. Ms. Novak went to the VA in 1981 for help, and if you look at the records leading up to that, she was crying for help frequently and being rejected every time. Now, once the diagnosis of schizophrenia, which I don't think anybody disputes as being incorrect, was issued by Dr. Curran, her cries stopped, and I think the factual record establishes that it did injure her. She stopped going to the VA. She stopped complaining. She stopped trying to say that she had a problem with the Army because at this point she had a diagnosis that was incorrect and a diagnosis that frightened her incredibly and sort of sent her on her way. Now, down the road we get to the point where she has another auto accident, and I think the government and I think the district court focused a little too much on the injuries, the physical injuries that occurred in this auto accident. Our claim wasn't, as the court suggests it was, that the VA was negligent between 1986 and 1991 for failure to diagnose a traumatic brain injury. That isn't the claim. Our claim is that in 1991, when the VA did diagnose a traumatic brain injury, they were negligent in not following their own protocols, following their own practices required by their protocols to investigate and determine what the cause of this brain injury was, which ultimately in 1999 we find out was the 1977 accident. And your theory is that the failure at that point to say, well, it was actually caused by the automobile accident, caused her latent post-traumatic stress disorder to become chronic. Well, it became chronic over a period of time. I mean, in a sense, I mean, shorthanded, that's your theory?  And the district court basically didn't buy that as a factual matter, right? Well, I don't know that the district court didn't buy it as a factual matter. I think the district court completely missed what our theory was, and that's what I was getting at with the outline I was talking about. The district court discussed in all of their findings that it talked about our claim of a failure to diagnose a traumatic brain injury between 86 and 91 as being the linchpin of our case, and that wasn't the linchpin. Between 86 and 91, Ms. Novak was being primarily treated for physical issues arising out of that auto accident. And then we get into the Wilkowski issue, and all that testimony comes in, and that testimony comes in on a premise that really had nothing to do with the claims that we were making. We weren't trying to say that because she may have exaggerated, I think the government was trying to say because she may have exaggerated her physical injuries, therefore she's claiming that the government or the VA was negligent in not diagnosing traumatic brain injury in that time period. Between 86 and 91, we didn't expect a diagnosis, and we're not making that claim. We're claiming that once that diagnosis was made, they couldn't then rely on her self-reports of what her life was like before. They had protocols they needed to go look at the record. The record told a story. You mentioned the protocols, but the government says that the protocol you're referring to is from 2003. Now, was there a protocol? Is there in the record a protocol that was in place in 1991? Yes. The actual written protocol, you're right, Your Honor, was published sometime later, but there was testimony from our expert that all of the indices in that protocol that he was relying on in forming his opinion go back to, well, even before 1977, as the standard of care for physicians treating patients in that case. Can you point me to that in the record, or maybe, Henry Butler, you could point that to me? I didn't see that specific language. And there was also some testimony from Dr. Holtzgang explaining why there was no reason for him to have gone back to request the whole record. He says that as the individual recovers, the length of retrograde amnesia typically shrinks to a few hours or a couple of days, so he had no indication that Ms. Toro should not remember her early life or wouldn't be a reliable witness. So I saw that supporting the district court's conclusion, and I wasn't sure what evidence was supporting the position that that was a breach of the standard or fell below the standard of care. Well, I think the point, Your Honor, is that the records would show that something happened back there. Number one, this auto accident in 1986 was never factually presented to Dr. Holtzgang or Dr. Springer as being significant enough to cause brain injury. There was no claim that she hit her head or anything of that nature. The military records, though, that were referenced by Dr. Cohen, I think it was, and then later Dr. Boza, confirmed that the Hunter reports, her commanding officer said they saw a decline of achievement and other things were in that C file if they looked at it to show that, no, this really wasn't a person who came out of the military and did great. There were all kinds of records to suggest that the opposite happened, and she had to do the investigation on her own to establish that. I'm just looking for the testimony that says that failure to get the entire and review the entire file fell below the standard of care for this injury. Well, I'm certain that Dr. Bernstein testified to that. I don't know that I'm going to be able to grab that testimony, Your Honor, right now or find the precise place, but he was asked and he did testify that all of these protocols, these standards were the standard of care as early as 1977, and he testified about why and how important it is to look at these records so that you don't get misled by a brain-injured patient who might give you a history that's completely inaccurate. I see my time is about up, but I know I've got to have a little bit for rebuttal on an issue that the government has raised, but I'm happy to answer any other questions. I think the briefs— I think we're okay right now. We'll get back to you. Thank you. Mr. Helper. Good morning. May it please the Court. Tom Helper for the defendants of the United States. I want to go straight to what I think is the crux of the Court's decision, which is the ruling that even if the government at some point, at any point really in its history, had gone back and looked at the entire medical history dating back to 1977, there was nothing in that record that would suggest a traumatic brain injury, which is the district court's explicit finding. Plaintiff failed to establish that Plaintiff Novak exhibited signs and symptoms of traumatic brain injury prior to 1991 that should have alerted the VA to the possible diagnosis of a traumatic brain injury. So I think the only question really is, is there factual support in the record for that finding? And I would suggest that there is ample factual support, some of which I think has been referred to already by various questions. None of the many providers who saw her between 1977 and 1991 saw any reason to believe she had a traumatic brain injury. The record of the 1977 accident itself indicates only mild cervical strain, return to duty, and the record indicates that she did, in fact, return to duty. She was seen extensively on an inpatient and an outpatient basis at both VA facilities and at private facilities, including numerous, a couple of inpatient stays at psychiatric institutions, private psychiatric institutions in Texas and in New York. When was this post-traumatic syndrome discovered or diagnosed or was it ever diagnosed? It never was. It was never diagnosed by. It alleges that she began to suffer from a post-traumatic syndrome after the 1986. But I couldn't find any evidence as to who decided that that's what she had or that it was diagnosed by a VA doctor. Well, I should have asked counsel, but his time was gone. But actually, there was a I think a weak indication on a single test in the late 90s that was suggestive of PTSD. But in fact, the doctor who administered that test, Dr. Springer, did not believe she had PTSD. Plaintiff's argument on PTSD, as I understand it, is that it was the misdiagnosis itself, the alleged misdiagnosis in 1991 that caused her to feel betrayed by the VA, to feel that she'd been abandoned by the VA. And this is explicitly in Dr. Bernstein's testimony that it was this feeling of betrayal that she had when she reviewed the medical records in 1999 that caused latent PTSD to become full-blown PTSD. That's the theory, as I understand it. So the theory is really dependent on a finding that there was, in fact, a misdiagnosis prior to 1991 because it's this missed chance that allegedly gave rise to the PTSD, the realization that she could have had a different life had she not been the victim of negligence in this pre-1991 period. Could I ask you about another question? Under Rule 52, we usually give quite a bit of deference to findings made by a trial judge. When they farm out the findings to the parties, we don't give them that much deference because then we have to look at the kind of self-serving stuff that creeps into findings that are written by the lawyers for the winning side. And we've had a number of opinions where we've mentioned that we aren't sure as sure of those findings as we are. Those are actually made by a by a judge. Now, what about these? How much of the how much of these findings are 56 pages of mixed findings and conclusions? How much of that is kind of judge work that we should give deference to? My recollection, this was not raised on an appellate, but my recollection is that the way it happened was that the judge, the district court judge issued extensive findings and then asked the parties or asked me really to provide the record citations to support the findings or to look at the record citations and fill in the citation. Essentially, yes, because it was a magistrate as opposed to I didn't write or the government did not write the opinion. My recollection is that we, in fact, just provided a lot of the record citations that were to a preliminary order, essentially, that the district court issued several months prior to the final version of the findings, effects and conclusions of law. So returning briefly to this PTSD issue, the district court rejected that because it found, look, there's no evidence of pre-1991 negligence, misdiagnosis. Therefore, there can't be this perception that the plaintiffs supposedly had in 1999 of misdiagnosis was simply erroneous and therefore negligence. To the extent she had PTSD, to the extent that it was the evidence. Apparently, this misdiagnosis of schizophrenia in 1981 had some negative effect on the on the patient or the plaintiff. But when was that discovered or was it ever discovered that that was a misdiagnosis? Let me disagree with the premise of your question. First, I don't think there is anything in the record to suggest, in fact, that there was a negative result from that. Put another way, it would bother a lot of normal people if some doctor turned them loose on the public and said, you're you're crazy. You got schizophrenia. It might bother a lot of people. But Ms. Novak herself testified that she was unaware of that diagnosis until much later, until she actually read the record in the late 90s. She said she didn't know about the diagnosis. So and I think there's also a significant problem, an intersection with the statute of limitations argument, that if she was aware of this diagnosis in the mid 80s and through the mid 80s. And in matter of fact, there's some indication of the record that she was based on correspondence in the late 80s in which she referred to her psychiatric record. In that case, that simply bolsters the statute of limitations argument that she's aware of this diagnosis. She's certainly aware in the early 90s that her VA physicians actually believe the cause of her problems to be a traumatic brain injury. And she's also aware that she's got this significant psychological history from the late 70s and the early 80s. Now, her doctors were not aware of that history because she didn't tell them about it. Extensive notes in the record indicates that she consistently said, I have no hospitalizations. I had no serious injuries. I had no problems prior to 1986. And I think it's important to realize what exactly was argued to the district court. As I understand plaintiff's argument on appeal, they're sort of disclaiming any argument regarding the 86-91 period. There's no disclaimer like that in the complaint, in the plaintiff's trial brief. As a matter of fact, in the plaintiff's opening statement, starting at page 33 of the first day of trial, counsel talks about the 1986 accident, talks about the physical manifestations of what happened after that for several pages. And being significant to the case. So appropriately, the district court addressed those claims at some length. Because starting in 87 was when the VA had the most significant interaction with Ms. Novak. The most extensive opportunity, if there was going to be a diagnosis, or a blown diagnosis, that's when the blowing most likely would have occurred was in this 87 period because that's when they saw her the most. Again, returning to this issue of the district court's finding that there was no evidence prior to 1991 of evidence in the record of traumatic brain injury. I think this is really a causation finding. Judge Ikuda referred to really what was a breach question. Was there proof of a breach? The district court, I think, found that even if you assume that they were supposed to look at the records, even if you assume that they went back and looked at all the records, what would they have seen? They would not have seen any evidence suggestive of traumatic brain injury. And we've cited a lot of support for that. In addition to what's in our brief, the defendants retained a distinguished expert, Dr. Igor Grant, who helped write the book on traumatic brain injury, who in fact reviewed the medical records extensively and determined and testified that there was no reason to believe that she suffered a head injury in the 1977 accident or in the years following. And that, again, provides substantial support to the district court's opinion on that issue. I want to turn to the statute of limitations argument briefly. I think the district court did err in its findings there or in its legal standard there. What the district court held was essentially that because of the complexity of the case and the voluminous medical records that you couldn't really expect a plaintiff to really fully understand the two requirements for a misdiagnosis case, which are a knowledge of a preexisting condition and knowledge of a worsening of that condition. That standard, complexity of the case and voluminous records, is practically identical to the standard that was rejected in the seminal Kubrick case, in which the Supreme Court said that simply because of the complexity of a case, the technical complexity of a case, to an untutored layperson, that's not grounds for tolling the statute of limitations. So I think that we have to look at what the record does show and what, as a matter of fact, the district court found that the record showed about the plaintiff's knowledge and what that would have meant to a reasonable person in her shoes prior to May of 1997. That's the crucial date because that's two years prior to the filing of her administrative claim. So that's sort of the cutoff time. What had happened before May of 1997? Well, we have 1981, the diagnosis by Dr. Curran. In 1988, we have a letter in which Ms. Novak writes to the VA and says, don't release any of my psychiatric records to anybody who might seek them in the lawsuit that I'm filing about the 1986 accident against a private party in Virginia. So she knows about her psychiatric history. In 1992, she's in a VA hearing where a letter is read that says that her current doctor believes that the cause for problems is brain injury and that she's been, in fact, misdiagnosed for years. And then finally, in 1996, we have her own statement to her psychologist specifically referring to the 1977 accident, misdiagnosed to 76, saying that she'd been suffering for the entire period and that the accident had gone undiagnosed. So I think that constellation of fact is far more than is required to show that she had all the facts that she needed to know in order for the statute of limitations to begin running. In addition, she actually had begun her investigation. She had written to the VA in Albuquerque, knowing apparently about her psychiatric treatment there in 1979 or 1980, stating that she wanted her records. This is in August of 1996. She writes to the VA in Albuquerque seeking her records. So she's actually started her investigation at a time when indicating that she knew about the injury and its cause. Now, does that affect the district court's decision that the PTSD claim was not barred by the statute of limitations because it really arose when she discovered in Dr. Burstyn's office this history of misdiagnosis? I hesitate to answer that because I just have a hard time really grasping the PTSD theory. Do we need to find that the district court's holding on that was clearly erroneous? On the statute of limitations issue? That the PTSD injury arose in 1999, I guess. I think that there's factual, independent of the statute of limitations argument, there are certainly a basis for affirming the district court's ultimate rejection of the issue, as I've talked about. But as to the statute of limitations argument, I think that there is case law that suggests that PTSD arising from time-barred malpractice is itself time-barred, that that's a consequence of the injury and therefore is also time-barred. And I think we've cited a non-Ninth Circuit case in our brief to that effect. Unless the court has other questions. All right. Thank you, Mr. Helper. Mr. Millen. Thank you. I have a very brief time. I'll talk first about the statute of limitations. I think both Judge Maweoki and Judge Kobayashi considered the facts surrounding the case. They made a finding. I don't think it was clearly erroneous. They relied on Augustine and McGraw, two cases that do fit the facts of this case, and I think the cases relied on by the government don't fit the facts of this case. And I think the finding was correct. I want to talk about the injury in 1977. There was significant testimony, although we don't have a lot of records back from 1977. We did have the testimony of Colonel Hunter as to how serious this accident was. He described bruising. He described neck brace and inability to return to work for 30 to 60 days, et cetera. And then the decline in her performance. And these are all the causal links that could have been found in the record had the doctors looked back and tried to determine what really happened and what caused the traumatic brain injury that they finally did diagnose in 1991. And PTSD was diagnosed by Dr. Bernstein. It was diagnosed by Dr. Springer, and it was diagnosed by several physicians, Dr. Boza, several physicians thereafter within the VA system. So there truly was a diagnosis within that system. Thank you. Thank you, Mr. Millen. Thank you, counsel. The matter just argued will be submitted, and the court will stand in recess for the day.
judges: Goodwin, Rymer, Ikuta